IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

ALONZO MOREFIELD, JR.,

    Plaintiff,

v.

CIVIL ACTION NO.:CV607-073

LARRY BREWTON; STEPHEN UPTON;
JOHN PAUL; LISA WATERS, and
DANETTE GORE,

    Defendants.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Alonzo Morefield ("Plaintiff"), who is currently incarcerated at Johnson State Prison in Wrightsville, Georgia, filed an action pursuant to 42 U.S.C. § 1983 contesting certain conditions of his confinement at Georgia State Prison ("GSP") in Reidsville, Georgia. Defendants filed a Motion for Summary Judgment, and Plaintiff filed a Response. For the reasons which follow, Defendants' Motion should be **GRANTED**.

## STATEMENT OF THE CASE

Plaintiff asserts he was housed in the premier housing unit (K dormitory) at GSP for almost four (4) years before he was moved to another housing unit (E2 dormitory). Plaintiff asserts this new housing unit contained cells with bars on the doors (as opposed to the steel doors in the K domitory) and that there was tobacco smoke in the air at all times. Plaintiff contends nearly all of the inmates housed in this new unit were

AO 72A
(Rev. 8/82)

smokers, and that the smoke and other fumes remained on the top floor of this unit, which is where his cell was located. Plaintiff alleges his exposure to the second hand smoke caused sleep deprivation, coughing, burning eyes, and breathing difficulties. Plaintiff also alleges he has hypertension and chronic allergy and sinus problems and that these conditions became worse due to his exposure to the second hand smoke. Plaintiff avers he informed Defendants Larry Brewton, Stephen Upton, John Paul, and Lisa Waters of the problems he was experiencing because of his exposure to the second hand smoke, but Defendants did nothing in response. Plaintiff contends Defendants did nothing to help him because he had filed lawsuits against several members of the staff at GSP, including Defendants Upton and Paul. Plaintiff also contends Defendant Danette Gore, a nurse at GSP, knew of his health problems but did not address his health services requests.

Defendants assert that they were not deliberately indifferent to any of Plaintiff's alleged serious medical needs. Defendants contend Plaintiff's allegations against them are barred based on vicarious liability principles. Defendants also contend Plaintiff's retaliation claims are without merit. Finally, Defendants contend they are immune from suit based on qualified immunity.

## STANDARD OF REVIEW

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving part[ies are] entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1223 (11th Cir. 2004). An issue of fact is "material" if

it might affect the outcome of the case, and an issue of fact is "genuine" when it could cause a rational trier of fact to find in favor of the nonmoving party. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004). The court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. at 1260 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving parties bear the burden of establishing that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving parties must identify the portions of the record which establish that there are no genuine issues of material fact. Hickson, 357 F.3d at 1260 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). When the nonmoving party would have the burden of proof at trial, the moving parties may discharge their burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. Id. In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Acevado v. First Nat'l Bank, 357 F. 3d 1244, 1247 (11th Cir. 2004).

## DISCUSSION AND CITATION TO AUTHORITY

I. **Exposure to Environmental Tobacco Smoke/Deliberate Indifference Claim**

Defendants assert that Plaintiff did not have pre-existing asthma or chronic sinus and allergy problems, as there is no evidence that doctors previously diagnosed these

3

problems or told Plaintiff that exposure to environmental tobacco smoke ("ETS") exacerbated these problems. Defendants contend that they were not indifferent to Plaintiff's serious medical needs because they were unaware of these "unfounded" medical needs. (Doc. No. 100-1, p. 9). Defendants allege that some of Plaintiff's complaints can be attributed to the medications he was taking for his mental health issues, which cause dry mouth, rhinitis, and nose and mouth mucosal dryness. Defendants also allege that Plaintiff's examinations revealed that his lungs and chest were clear, and he did not present with signs of respiratory distress. Defendants further allege that an ear, nose, and throat doctor ("ENT") examined Plaintiff and found no evidence of sinusitis or nicotine or nicotine metabolites. Defendants assert that Plaintiff was not taking all of his prescribed antihistamines, despite his claims of severity and his repeated sick call visits for alleged sinus and allergy relief. Defendants contend that GSP's medical director instructed staff to treat Plaintiff with only normal saline or Decadron nasal spray rather than with antihistamines for two (2) reasons: 1) there were allegations that Plaintiff was selling his antihistamines and the discovery of nearly 200 pills in his cell; and 2) Plaintiff was only diagnosed with rhinitis. Defendants also contend that Plaintiff did not present with any physical limitations associated with breathing illnesses while he was housed at GSP or after he was transferred to Hays State Prison.

Defendants aver that, even assuming Plaintiff has serious medical needs, he was not exposed to excessive amounts of ETS during his two-month confinement in the E2 dormitory. Defendants state that GSP has a no smoking policy in all dormitories, and all inmates are told verbally and in writing about this policy. Defendants assert that the

AO 72A
(Rev. 8/82)

dormitories in the Special Management Unit ("SMU") are inspected every 30 minutes and every morning. Defendants also assert that Defendant Brewton did not witness any inmates smoking, smell cigarette smoke, or receive any reports of inmates smoking while Plaintiff was housed in the E2 dormitory. Defendants further assert that Defendants Paul and Upton did not receive any information regarding Plaintiff's alleged exposure to ETS in the E2 dormitory. Defendants contend that the ventilation system in E2 is "more favorable" than the system in K-4 because E2 dormitory does not have windows on the doors. (Doc. No. 100-1, p. 13). Defendants allege that E2 dormitory has five (5) large exhaust fans on the roof, a large fan that blows air back into the dormitory, and an exhaust system. Defendants also allege that each cell has a window measuring eight feet in front of it and a vent at the back. Defendants contend that the maintenance staff "conducts weekly inspections, monthly dormitory fan cleanings, and seasonal ventilation checks for constant airflow quality." (Id.). Defendants state that inmates housed in E2 dormitory often set fires in the dorms, and, when they do, maintenance staff extinguish the fire, clean the area, and have inmates examined for smoke inhalation, if needed. Defendants assert that, during the time Plaintiff was housed in E2 domitory, incident reports were written for fires on July 26, August 5, and September 17, 2007, and Plaintiff reported to medical with complaints within days of those fires, was examined, and treated. Defendants assert that Defendant Gore did not ignore Plaintiff's medical requests concerning alleged exposure to ETS, and Defendant Waters did not fail to supervise Defendant Gore. Defendants contend that Defendant Gore examined Plaintiff on one particular occasion, noted that he was able to talk and breathe through his nose with no indication of sinus trouble, and declined to give him

5

medication not prescribed by a doctor. Defendants also contend that Plaintiff cannot show that they acted with a sufficiently culpable state of mind, as they did not know of Plaintiff's alleged breathing issues and because E2 dormitory was adequately ventilated to prevent excessive exposure to ETS.

Moreover, Defendants assert they were not deliberately indifferent to Plaintiff's future health. Defendants contend that, under an Eighth Amendment analysis, a prisoner must show that prison officials exposed him to ETS levels which pose an unreasonable risk of serious damage to his future health, society will not tolerate his risk exposure, and prison officials were deliberately indifferent to that risk. Defendants assert that a restrictive smoking policy, which Plaintiff acknowledges GSP had in place, weighs heavily against a finding of an Eighth Amendment violation.

Plaintiff avers that he is a lifelong non-smoker, and he suffers from hypertension, asthma, and chronic sinus and allergy conditions. Plaintiff asserts that he informed all of the Defendants verbally and in writing of his conditions, yet they "collectively exposed him to high levels" of ETS while he was housed on the E2 dormitory at GSP from July 24 until September 25, 2007. (Doc. No. 119, p. 1). Plaintiff also asserts that his exposure to ETS caused him sleep deprivation, coughing, sneezing, watery eyes, congestion, and breathing difficulties and exacerbated his pre-existing conditions. Plaintiff contends that the inmates were not told of the no-smoking policy, and staff and prisoners did not follow it. Notwithstanding these contentions, Plaintiff states that "[t]he daily inspections are done to ensure the dorms are clean and beds are made. No smoking will be done at that time. However, prisoners will light up immediately following the exit of the inspection team." (Doc. No. 121, p. 3). Plaintiff also contends that the

6

ventilation at GSP was poor. Plaintiff further contends that the fires inmates set in E2 dormitory were not extinguished, and after the fires burned out on their own, inmate orderlies often cleaned up the next day. Plaintiff denies ever having used tobacco and asserts that he had tobacco products in his possession as a form of "prison money." (Doc. No. 119, p. 3). Plaintiff contends that the non-smoking policy was not followed at GSP and that staff provided the "lights for the tobacco." (Id. at 4). Plaintiff also contends that the exhaust fans in E2 dormitory never worked and were never cleaned, and he was made to suffer "unbearable" exposure to ETS. (Id.).

The Supreme Court has held that a cause of action exists under the Eighth Amendment "when a prisoner alleges that officials have, with deliberate indifference, exposed him to levels of [environmental tobacco smoke] that pose an unreasonable risk of serious damage to his future health." Helling v. McKinney, 509 U.S. 25, 35 (1993); see Kelley v. Hicks, 400 F.3d 1282, 1284 (11th Cir. 2005). Like any deliberate indifference claim, both an objective and a subjective component are incorporated into a court's analysis. Hill v. DeKalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994). The objective component is "contextual and responsive to 'contemporary standards of decency.'" Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal citation omitted).

Helling requires both exposure to unreasonably high levels of ETS and knowledge of the exposure by prison officials. Helling, 509 U.S. at 35-36; Kelley, 400 F.3d at 1284. "[T]he objective factor, determining whether [a plaintiff's] conditions of confinement violate the Eighth Amendment, requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such

7

injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling, 509 U.S. at 36. When determining the objective elements of a prisoner's claim, "[r]elevant facts include whether the prisoner remained housed in the environment and whether the facility has enacted a formal smoking policy." Kelley, 400 F.3d at 1284 (citing Helling, 509 U.S. at 35-36). "[T]he subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct. . . . the adoption of [a] smoking policy. . . may bear heavily on the inquiry into deliberate indifference." Helling, 509 U.S. at 35-36.

During the relevant period, GSP had in place Standard Operating Procedure ("SOP") IIA09-0001, which is the policy "to restrict the possession and consumption of tobacco products by staff, inmates, visitors, and all other persons[.]" (Doc. No. 100-3, p. 13). This SOP permitted smoking and other uses of tobacco by inmates in "designated outside areas at prescribed times" and prohibited the same inside any building or office. (Id. at 13-14). This policy also allowed inmates to possess and buy tobacco products, except for matches, lighters, and "other devices[.]" (Id. at 14). Additionally, the Georgia Department of Corrections' Handbook counsels against "[s]moking in any area or building whenever or wherever smoking is restricted or prohibited." (Doc. No. 100-7, p. 17).

Defendant Brewton declares in his Affidavit that administrative segregation dormitories, such as E2, were inspected every 30 minutes, and he reviewed the inspection logs for compliance and routinely took part in these inspections. Brewton

8

states that he "did not witness any inmates in E2 [dormitory] smoking, smell smoke, or receive any reports of inmates smoking[ ]" during the period Plaintiff was in that dormitory. (Doc. No. 100-2, p. 4). Brewton also states that, had he been aware of any inmates smoking in E2 dormitory, he would have issued that inmate a disciplinary report for the violation of the SOP and would have directed the officers under his supervision to do the same. Brewton further states that he was unaware of any health issues Plaintiff claimed to have had regarding any alleged exposure to ETS while he was housed in E2 dormitory.

Defendant Upton, who was the Warden at GSP in 2007, attests that inmates are allowed to smoke only at designated places during designated times, and inmates are advised of this policy verbally and in writing. Upton declares that prison personnel "take this policy seriously and enforcement is maintained to the best of the staff's ability[,]" particularly the taking of disciplinary action when an inmate is found in violation of this policy. (Doc. No. 100-7, p. 3). According to Upton, the ventilation system in E2 dormitory "was adequately maintained and the smoking policy was enforced." (Id. at p. 4). Upton declares that he had no knowledge of Plaintiff's alleged pre-existing medical conditions, nor does he recall getting information that Plaintiff was exposed to ETS while he was housed in E2 dormitory.

Defendant Paul, who is the Deputy Warden of Care and Treatment at GSP, affirms that GSP's non-smoking policy is "strictly enforced" and violators of this policy are "punished when such behavior [can] be confirmed." (Doc. No. 100-8, p. 3). Paul states that he was unaware of Plaintiff's pre-existing medical conditions relating to breathing difficulties. Paul also states that, if Plaintiff had "presented his medical

9

complaints to [him, he] would have directed [Plaintiff] to the medical division and instructed him to use the sick call" procedures in place at GSP. (Id.).

Defendants submitted the Affidavit of Wendell Fowler ("Fowler"), the Deputy Warden of Administration, whose duties include overseeing GSP's maintenance and environmental departments. Fowler declares that the cell doors in E2 dormitory have bars as opposed to windows.[1] Fowler also declares that the ventilation system in E2 consists of five (5) large exhaust fans on the roof and one (1) large fan that blows air back into the building, and the exhaust system, which draws in fresh air, consists of a window eight (8) feet in front of the cell and a vent at the rear of each cell. Fowler also declares that members of his staff conduct weekly inspections in E2 for smoke-related hazards, clean all fans on a monthly basis, and conduct seasonal checks on the ventilation system. Fowler further declares that inmates housed in E2 dormitory "often set tissue paper, clothing, or other items on fire[,]" which resulted in three (3) incident reports being written during the time Plaintiff was housed in E2 dormitory. (Doc. No. 100-9, p. 4). Fowler states that, on those occasions, the maintenance department "quickly responded by putting out the fire, cleaning the area, and having medical examine the inmates for smoke inhalation, if necessary." (Id.).

In her Affidavit[2], Defendant Waters, the Health Services Administrator at GSP, avers that she does not recall Plaintiff complaining to her about Defendant Gore's care, or the lack thereof, for Plaintiff medical needs relating to ETS. Waters states that she

---

[1] The undersigned presumes Fowler makes this comparison in his Affidavit to show that the cell doors in E2 dormitory allowed better air flow in the cells than those in K dormitory.

[2] Waters certifies "that the material relating to [Plaintiff's] medical history that are attached to this affidavit are true and accurate copies of documents maintained by the" Georgia Department of Corrections. (Doc. No. 100-11). However, these documents were not attached to Waters' Affidavit or otherwise submitted by Defendants.

AO 72A
(Rev. 8/82)

was unaware of any medical problems, including asthma or sinus issues, that Plaintiff may have had relating to his alleged exposure to ETS. (Doc. No. 100-11).

Finally, Defendants submitted the Affidavit of Kenneth Stroub, D.O. ("Stroub"), who is the Medical Director at Hays State Prison in Trion, Georgia. Stroub states that Plaintiff did not "present with any noticeable physical limitations" while he was housed at Hays State Prison.[3] (Doc. No. 100-10, p. 6). Stroub declares that he discontinued Plaintiff's bottom bunk and work detail restrictions in March 2008 based on "credible reports" that Plaintiff refereed basketball games for three (3) weeks in December 2007. (Id.). According to Stroub, Plaintiff physically was capable of keeping pace with a 40-minute basketball game. Stroub states that Plaintiff cleaned floors on his hands and knees and was able to bend and stand to do so.

Plaintiff states in his Affidavit that the E2 dormitory was inspected for "cell readiness only", i.e., to make sure the beds were made or the inmates' shoes were lined up properly. (Doc. No. 117, p. 2). Plaintiff admits that GSP has a non-smoking policy, but he states that the policy is not followed. In support of this contention, Plaintiff asserts that he will have three (3) fellow inmates and a correctional officer testify to this. Plaintiff declares in response to Defendant Brewton's statement that he did not see any smoking in E2 dormitory that "no inmates smoke while daily inspection is being conducted[ ]", and that inmates and officers would resume smoking immediately after

---

[3] The undersigned credits only those portions of Stroub's Affidavit detailing events which occurred at Hays State Prison and which are based on Stroub's own recollection. Stroub asserts that he made his affidavit based, inter alia, on his review of Plaintiff's medical chart from September 2006 until his transfer to Hays State Prison on September 25, 2007. (Doc. No. 100-10, pp. 2-3). "If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit." FED. R. CIV. P. 56(e)(1). Defendants' counsel failed to attach Plaintiff's medical records to Stroub's Affidavit. While Plaintiff's medical records would not be determinative of the issues before the Court, they certainly would have been helpful in the undersigned's analysis and would have bolstered Defendants' position. Should Plaintiff file the letters and other documents he references in his Affidavit with any Objections he may file to this Report, however, Plaintiff's medical records would become much more important.

11

Defendant Brewton left the dormitory. (Id.). Plaintiff states that he notified Defendant Brewton in writing of his health problems, yet Defendant Brewton was deliberately indifferent to his medical needs. Plaintiff notes that he will call Dr. Tommy Jones, the doctor at GSP, to testify on his behalf, and finds it odd that Defendants submitted Stroub's Affidavit rather than one from Dr. Jones. Plaintiff declares that Stroub examined him on November 2007 and ordered Allcolate, an asthma-controlling medication, and two (2) different inhalers and later prescribed Claritin and CTMs. Plaintiff also declares that he verbally and in writing notified Defendants that the high levels of ETS hovering in the E2 dormitory aggravated his illnesses and caused him sleep deprivation, coughing, burning eyes, and breathing difficulties. (Id. at p. 5). Plaintiff states that Defendants Paul, Upton, and Brewton were deliberately indifferent to his serious medical needs by failing to move him to another dormitory, and Defendants Gore and Waters were deliberately indifferent to his serious medical needs by failing to address his sick call requests until the third or fourth request. Plaintiff also states that he will provide copies of these letters and sick call requests at trial. Plaintiff also states that no medical provider "would tell [him] that [exposure] to ETS will exacerbate [his] illness[es]. They would be held liable if they did." (Id. at 6). Plaintiff further states that he visited medical with smoke-related complaints, which should have made it obvious even to a lay person that he could not endure ETS exposure and that he had breathing problems.

While Plaintiff states in his Affidavit that he will present copies of letters he wrote to Defendants notifying them of his medical conditions and exposure to ETS, as well as copies of his sick call requests, this is insufficient for Plaintiff to successfully oppose

Defendants' Motion. FED. R. CIV. P. 56(e)(1); see n.3, supra. Plaintiff has offered nothing other than his bare allegations that Defendants knew: he was allegedly exposed to ETS in E2 dormitory at any level, particularly an "unreasonably high level[ ]" Helling, 509 U.S. at 35-36; this alleged exposure exacerbated his pre-existing medical conditions; he allegedly had pre-existing medical conditions; or, that Defendants otherwise were deliberately indifferent to Plaintiff's medical needs or future health. Plaintiff acknowledges, however, that GSP had a no-smoking policy in place at the time he was housed in E2 dormitory, and his quibble with this policy is that it was not followed because inmates (and staff) would smoke after the inspection team left the dormitory. Giving Plaintiff every benefit of the doubt, at best, he has shown Defendants were negligent in enforcing GSP's no-smoking policy. Unfortunately for Plaintiff, this showing is insufficient to sustain an Eighth Amendment claim. See Kelley, 400 F.3d at 1285. Plaintiff also acknowledges that no medical provider told him that his alleged exposure to ETS exacerbated his conditions. Further, as evidenced by Stroub's Affidavit, there is no indication that Plaintiff's future health has been compromised based on his alleged exposure to ETS while he was housed in GSP's E2 dormitory for a two-month period. This portion of Defendants' Motion for Summary Judgment should be granted, as Plaintiff has failed to establish a genuine issue of material fact.

## II. Retaliation Claim

Defendants assert that they did not retaliate against Plaintiff by housing him in E2 dormitory because he filed lawsuits against GSP officials and held himself out as a "'jailhouse lawyer.'" (Doc. No. 100-1, p. 16). Defendants assert that Defendant Brewton's decision to house Plaintiff in E2 dormitory was based on the security interests

of his unit, and his decision was approved by the Classification Committee. Defendants contend that "[e]scalating issues" caused Defendant Brewton to move Plaintiff three (3) times in 2007 "in an effort to curtail his behavior." (Id. at 18). Defendants allege that Defendant Brewton considered Plaintiff's risk of escape, "manipulative behavior, complacency in K-4 dormitory, and manipulation of other inmates" when Defendant Brewton moved Plaintiff to E2 dormitory. (Id.). Defendants state that Plaintiff did not buy anything from the commissary since 2004, but his inventory items often were excessive in number and contained contraband items that other inmates sent to him for legal services. Defendants contend that there "was a growing unrest amongst inmates who received unfavorable decisions in their cases that they had compensated Morefield to assist with in his 'jailhouse lawyer' capacity." (Id. at 19). Defendants also contend that Plaintiff had disciplinary infractions which warranted his removal to another unit, including mailing confiscated property, forging information to mail documents, and having 192 pills and 5 razors in his cell. Defendants conclude that Defendant Brewton's decision to place Plaintiff in E2 dormitory was based on security needs, not in retaliation for Plaintiff's litigiousness.

Plaintiff alleges that there were no security issues which prompted Defendant Brewton to move him to E2 dormitory. Plaintiff asserts that Defendants' actions hindered his ability to effectively litigate another civil lawsuit, Morefield v. Smith, CV607-10. Plaintiff also asserts that Defendants' contentions were rejected by this Court on Defendants' Motion to Dismiss.

"To state a First Amendment claim for retaliation, a prisoner need not allege violation of a separate and distinct constitutional right." Farrow v. West, 320 F.3d 1235,

1248 (11th Cir. 2003) (internal citations omitted). Rather, "[t]he gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech." Id. A prisoner can establish retaliation by demonstrating that the prison official's actions were "the result of his having filed a grievance [or lawsuit] concerning the conditions of his imprisonment." Id.

Once the defendants move for summary judgment, "the plaintiff may not respond simply with general attacks upon the defendant[s'] credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." Crawford-El v. Britton, 523 U.S. 574, 600 (1998). The issue of intent is a question for the trier of fact. Direct evidence of an illegal motive will usually suffice to create a genuine issue of fact and preclude summary judgment. Harris v. Ostrout, 65 F.3d 912, 917 (11th Cir. 1995) (citing Swint v. City of Wadley, Ala., 51 F.3d 988, 1000 (11th Cir.1995)).

Defendant Brewton states in his Affidavit that Plaintiff was housed in administrative segregation when he arrived at GSP because "he was an escape risk, was involved in the conviction of a former sheriff, and received repeated disciplinary violations[,]" including attempting to mail confiscated property, using another inmate's information to mail documents, and having nearly 200 pills and 5 razors in his cell. (Doc. No. 100-2, pp. 3, 15-19, 22-32). Defendant Brewton also states that, as Unit Manager, he considers the following safety factors when moving an inmate to another dormitory: risk of escape, behavior, exchange of contraband with other inmates, complacency in an area, and manipulation of other inmates. Defendant Brewton declares that Plaintiff was administratively transferred three (3) times in 2007 before he

15

was transferred to Hays State Prison and that his (Brewton's) decisions to transfer inmates are reviewed by the Classification Committee. Defendant Brewton avers that Plaintiff had a documented history of "manipulating situations and people within the prison." (Id. at p. 6). Defendant Brewton declares that officers repeatedly confiscated contraband items[4] such as compact discs, letters, and food sent from other inmates "in exchange for his 'alleged' legal services[,]" despite not having made a purchase at the prison commissary since 2004. (Id.). Defendant Brewton also declares that "there was a growing unrest amongst inmates who received less than favorable decision (sic) in their cases that they had paid [Plaintiff] to handle in his 'jailhouse lawyer' capacity." (Id.). Defendant Brewton states that he ordered Plaintiff to be transferred from the K dormitory to the E2 dormitory and remain there until his transfer to Hays State Prison for the security of the prison.

Defendant Upton states in his Affidavit that the Unit Manager (Brewton) and the Classification Committee addressed Plaintiff's transfer to E2 dormitory. Defendant Upton also states that, unless he is "aware of a specific reason to reject" Brewton's and the Classification Committee's findings, he will not "disturb the decision." (Doc. No. 100-7, p. 4). Upton declares that he did not make any decisions regarding Plaintiff's intra-prison transfers as retaliation against Plaintiff for being an alleged jailhouse lawyer or for any other reason.

---

[4] Standard Operating Procedure ("SOP") IIB01-0010 governs the "control of contraband" in Georgia Department of Corrections' facilities, which "is a critical component of the security procedures of a facility[.]" (Doc. No. 100-3, p. 17). Contraband is defined as items "not explicitly authorized for possession, which are acquired through unauthorized means, which exceed personal property limitations on value or amount, . . ., which cannot be maintained in a neat and safe manner, or which present a fire, sanitation, security, or housekeeping problem[, or a]ny item which could be used to cause injury to an individual." (Id. at 17-18). SOP IIB06-0001 pertains to what items inmates may possess. (Doc. No. 100-4, pp. 22-26; Doc. No. 100-5, pp. 1-19). In addition, SOP IIB06-0002 directs in what manner inmates may acquire property, which does not include acquiring property from other inmates. (Doc. No. 100-5, p. 21).

16

Defendant Paul states in his Affidavit that he had no involvement in Plaintiff's transfer from K dormitory to E2 dormitory. (Doc. No. 100-8, p. 3). Likewise, Defendant Waters declares in her Affidavit that the medical division does not address dormitory assignments for inmates.

In his Affidavit, Plaintiff avers that Defendant Brewton intentionally moved him from K dormitory to E2 dormitory because: 1) Plaintiff is a "jailhouse lawyer" who files grievances, lawsuits and formal complaints with the courts and Georgia Department of Corrections' regional and central offices; 2) he helped other inmates file lawsuits, grievances, and complaints against GSP staff; 3) Brewton "oppressed" him by moving him to E2 dormitory, which has a different environment, size, and conduct by staff and other inmates than the K dormitory; and 4) there was no reason for Defendant Brewton to move him "other than by attempting to violate" his right to be free from ETS. (Doc. No. 117, pp. 1-2). Plaintiff also avers that Defendant Brewton's claim that Plaintiff was placed in administrative segregation relating to the investigation of filing false paperwork is not related to this case, and he did not receive a disciplinary report based on these claims because he did nothing wrong. Plaintiff also avers that all of the other disciplinary reports filed against him "were concocted in a voluminous scheme to defame [him] and oppress him into not filing this action." (Id. at p. 2). Plaintiff states that GSP was a maximum security prison in 2007, and all prisoners housed there were escape risks and that his high profile status "had long subsided." (Id.). Plaintiff also states that Defendants Brewton, Upton, and Paul did not use policy factors when moving him, but rather the decision was based on personal reasons due to Plaintiff being a grievance writer and litigator. Plaintiff further states that there is no documented

17

history of any manipulative behavior on his part, and Defendants did not submit any evidence of this contention. Plaintiff also states that he only provided advice to other inmates, and he would have refused any compensation for this advice. Plaintiff declares that there was not any growing unrest among inmates because of his advice, and he will call other inmates and an officer to verify this. Plaintiff attests that he never hoarded or misused any prescribed medications, and Defendants concocted this story as a method of retaliation. According to Plaintiff, the Classification Committee is a "rubber stamp" group with "no independent oversight" and decides matters according to what Defendants Brewton, Upton, and Paul desire. (Id. at p. 6). Plaintiff declares that Defendant Upton did not want to deal with him because he is a jailhouse lawyer and transferred him to Hays State Prison. Plaintiff also declares that Defendant Waters was deliberately indifferent to his serious medical needs because he was a jailhouse lawyer.

Plaintiff has offered no evidence revealing a genuine issue of material fact as to whether Defendants retaliated against Plaintiff. There is no evidence that Defendants knew Plaintiff filed lawsuits and grievances against them (or other GSP officials) and that they took retaliatory action against him by transferring him to another dormitory in response. Plaintiff sets forth nothing more than bare allegations to attack Defendants' credibility, which is insufficient to defeat Defendants' Motion. This portion of Defendants' Motion should be granted.

The undersigned notes Plaintiff's seeming contention that, because the Court rejected Defendants' assertions in their previously-filed Motion to Dismiss, the Court will act accordingly on this Motion. By denying Defendants' Motion to Dismiss, the Court found that Plaintiff, at that stage of the litigation of this case, made allegations sufficient

to defeat Defendants' Motion to Dismiss. This ruling allowed Plaintiff to live another day, so to speak, as the burden to overcome a motion to dismiss is exceedingly low. In contrast, the burden to overcome a motion for summary judgment is much higher and requires the production of evidence in support of the opposing party's position, which Plaintiff has failed to do.

Plaintiff's contention that Defendants' actions affected his ability to litigate Morefield v. Smith equally is without merit. Not only does Plaintiff offer nothing in support of this contention, a review of the Court's docketing system reveals that over 250 docket entries have been made in that case and the case currently is on appeal with the Eleventh Circuit Court of Appeals. (Case Number CV607-10; Appeal Number 09-10933-A).

It is unnecessary to address the remaining portions of Defendants' Motion.

AO 72A
(Rev. 8/82)

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that Defendants' Motion for Summary Judgment be **GRANTED**.

**SO REPORTED** and **RECOMMENDED**, this 2 day of March, 2010.

JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev. 8/82)